2021 IL App (1st) 200863-U

FIFTH DIVISION
May 21, 2021

No. 1-20-0863

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF KAMLESHKUMAR PATEL, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 2017 D 10689 |
| JALPA PATEL, | ) ) | |
| Respondent-Appellee. | ) ) | Honorable Robert W. Johnson, Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:* We have jurisdiction to hear this appeal because the notice of appeal was filed within the period provided for by the Illinois Supreme Court's order in response to the COVID-19 emergency. Appellant did not waive any issues on appeal by failing to file a postjudgment motion in the circuit court. We reverse the award of contribution for attorney fees because appellee failed to establish her inability to bear the costs of her own representation. We vacate the allocation of childcare and healthcare costs and remand for reallocation consistent with the requirements of the Illinois Marriage and Dissolution of Marriage Act. We otherwise affirm the judgment of the circuit court.

¶ 2                                  BACKGROUND

¶ 3    Kamlesh[1] and Jalpa Patel were married in February 2009 and are the parents of one child. In December 2017, Kamlesh filed a petition for dissolution of the marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/101, *et seq.*) (West 2016)). The court entered a visitation order and an order of temporary child support, effective July 1, 2018.

¶ 4    In November 2019, the circuit court held a bench trial at which each party testified. Kamlesh testified that he and Jalpa were wed in an arranged marriage in February 2009, in India. Five days after the wedding, Jalpa—at that time, a permanent resident of to the United States— returned to Illinois and began the process of sponsoring Kamlesh's immigration. He finally immigrated to the United States in May 2010. Kamlesh was unemployed for his first six months in America, during which time Jalpa supported him. Thereafter, Kamlesh worked a series of "odd jobs."

¶ 5    Kamlesh testified that Jalpa gave birth to their daughter in July 2011. From January 2012 until April 2015, their daughter lived in India with relatives. The parties did not have to pay the relatives to care for her.

¶ 6    From August 2012 through most of 2013, Kamlesh worked toward a master's degree in electrical engineering at a university in Peoria. During that time, he was housed and supported by a host family. He also earned $11 per hour working for the university and received a partial fee waiver. After receiving his degree, Kamlesh obtained an engineering job in Rockford. During that period, he maintained a home in Rockford and returned to Chicago on the weekends. He testified that he gave Jalpa cash periodically throughout that time. In 2015, Kamlesh moved to Mount Prospect. During that time, he provided Jalpa with a car, paid her taxes, and paid for insurance through his employer, but he did not give any money directly to Jalpa.

---

[1] Throughout their briefs, both parties refer to Kamleshkumar simply as "Kamlesh." We, therefore, do likewise.

¶ 7       Kamlesh testified that he earns a base salary of about $91,000 per year, plus bonuses and overtime. At the time of trial, he had two cars, approximately $32,000 in a 401(k) account, just over $62,000 in the bank, and approximately $7,000 in a pension account that had not yet vested.

¶ 8       Jalpa testified that she lives with her daughter, her father, her grandmother, and, from time to time, her sister and her mother. She testified that she alone pays the rent. Jalpa testified that she works approximately 60 hours per week and earns a combined $55,000 per year as a beautician and as a caregiver for her disabled father. She also testified that, although her grandmother used to babysit occasionally, she is no longer able to watch the parties' daughter for more than brief periods.

¶ 9       Jalpa testified that she paid for Kamlesh's immigration application and arranged for her sister to pay for his airfare from India. While Kamlesh was working toward his master's degree, Jalpa was working 40 to 50 hours per week. She testified that she sent their daughter to India during this time so that she could work and support Kamlesh while he earned his degree. By the time their daughter returned from India, Kamlesh was no longer living with Jalpa, and he only visited their daughter infrequently.

¶ 10      Jalpa also testified that their daughter required special education and a tutor for "focus loss." She testified that Kamlesh never attended parent-teacher conferences or contributed toward the costs associated with extra-curricular activities. When she asked him to contribute, he declined.

¶ 11      After the trial, each party filed written closing arguments and proposed judgments, and Jalpa filed a petition for contribution to attorney fees pursuant to various provisions of the IMDMA (750 ILCS 5/508, 5/501(c-1), and 5/503(j) (West 2018)).

¶ 12      The parties also filed a stipulation stating that,

"[b]ased upon the statutory guidelines set forth in the Illinois Marriage and Dissolution of Marriage Act, the parties agree and stipulate to set maintenance owed by [Kamlesh] to [Jalpa] at $199.42 for the period of 38 months, and to set child support owed by [Kamlesh] to [Jalpa] for the minor child at $849.40 per month."

¶ 13 At a subsequent court date, Kamlesh's counsel requested an evidentiary hearing on Jalpa's petition for contribution to attorney fees. The court denied the request and suggested that Kamlesh file written objections to the petition. In his amended response to the petition, Kamlesh reiterated his request for an evidentiary hearing so that he could question Jalpa and her attorneys on whether they had agreed that she would, in fact, pay the billed amount. He also pointed out that Jalpa had not signed the petition, questioned whether the attorneys' rates were reasonable, and alleged that certain billed items were "unjustified, unreasonable, unnecessary, and excessive." Attached to the amended response was an item-by-item list of charges that Kamlesh argued should be disallowed.

¶ 14 On June 9, 2020, the circuit court entered a judgment of dissolution of marriage, adopting Jalpa's proposed judgment *verbatim*. Among other things, the judgment awarded reviewable maintenance to Jalpa in the amount to which the parties had stipulated, ordered Kamlesh to pay 75% of Jalpa's total attorney fees and costs, ordered Kamlesh to pay retroactive child support from the date that Kamlesh filed his petition, and allocated a 70% share of the marital estate to Jalpa. The judgment also ordered Kamlesh to provide health insurance for the child through his employer, allocating 100% of the cost of the healthcare premiums and 60% of any uncovered medical costs to him. "In the event Kamlesh is unemployed," the judgment continued, "he will continue to pay for [the child's] insurance through COBRA or through a private health care provider."

¶ 15    On August 7, 2020, Kamlesh filed a notice of appeal, seeking review of the June 9 judgment under Illinois Supreme Court Rule 303(a) (eff. July 1, 2017).

¶ 16                                      ANALYSIS

¶ 17                                      Jurisdiction

¶ 18    This court has an independent duty to consider its jurisdiction. *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984). Ordinarily, "[t]he notice of appeal *must* be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from." (Emphasis added.) Ill. S. Ct. R. 303(a) (eff. July 1, 2017); see, also, *Granite City Lodge No. 272, Loyal Order of Moose v. City of Granite City*, 141 Ill. 2d 122, 127 (1990) (holding that the 30-day period runs from entry of the order by the clerk, regardless of whether the parties have actual knowledge of its entry). In response to the ongoing COVID-19 pandemic, on March 24, 2020, our supreme court entered an order temporarily extending "[t]he deadline to file a notice of appeal in the circuit court *** from 30 days to 60 days from the date of the circuit court judgment." *In re Illinois Courts Response to COVID-19 Emergency*, M.R. 30370 (May 21, 2020).

¶ 19    In his notice of appeal, filed on August 7, 2020, Kamlesh seeks review of the judgment of dissolution of marriage entered on June 9, 2020. Rather confusingly, the statement of jurisdiction in his opening brief does not address the fact that his notice of appeal was filed on the fifty-ninth day after the entry of judgment and, consequently, well beyond the deadline in Rule 303(a). However, the notice was filed within the extended 60-day period created by the Illinois Supreme Court. We therefore have jurisdiction to hear this appeal.

¶ 20                                      Waiver

¶ 21    Having concluded that we have jurisdiction to review this appeal, we next address Jalpa's argument that Kamlesh has waived his claims of error. Jalpa argues that Kamlesh failed to preserve his claims because he did not file a postjudgment motion in the circuit court.

¶ 22    "A posttrial motion is not necessary to preserve issues in an appeal from a bench trial." *In re Marriage of Minear*, 2020 IL App (1st) 182710, ¶ 60; see, also, Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994) ("Neither the filing of nor the failure to file a post-judgment motion limits the scope of review [in a nonjury case]."). Consequently, Kamlesh's decision not to file a postjudgment motion does not constitute a waiver of his claims.

¶ 23                              Standards of Review

¶ 24    Kamlesh asserts several claims of error. He argues that the circuit court erred in adopting Jalpa's proposed judgment *verbatim*. He also challenges several provisions of the circuit court's judgment, including the reviewability of maintenance, the distribution of assets, the contribution to attorney fees, the award of retroactive child support, and portions of the child support obligation. With respect to each of these issues, we review the circuit court's final disposition for an abuse of discretion. *In re Marriage of Sisul*, 234 Ill. App. 3d 1038, 1039 (1992) (maintenance); *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121 (division of marital property); *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 39 (attorney fees); *In re Marriage of Juiris*, 2018 IL App (1st) 170545, ¶ 18 (retroactive child support); *In re Marriage of Serna*, 172 Ill. App. 3d 1051, 1054 (1988), (child support). A trial court abuses its discretion only where no reasonable person would have ruled as the trial court did. *Romano*, 2012 IL App (2d) 091339, ¶ 121. Although we review the court's final disposition for abuse of discretion, we apply the manifest-weight-of-the-evidence standard to the circuit court's factual findings. *Id.* "A decision is against the manifest

weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *Id.* ¶ 44.

¶ 25                                    Proposed Order

¶ 26    We first address Kamlesh's contention that the circuit court erred by adopting Jalpa's proposed judgment *verbatim*. Each side submitted proposed judgments that were highly favorable to themselves. For example, with respect to distribution of the marital estate, Jalpa proposed a 70%-30% distribution in her favor, while Kamlesh proposed a 75%-25% distribution in his favor. Each party presumably made the most extreme requests that they could plausibly defend and assumed that the court would craft an equitable compromise. However, the court simply adopted Jalpa's proposed judgment without any modifications. Kamlesh argues that the resulting judgment is so one-sided that the circuit court must not have properly weighed the evidence. By simply adopting Jalpa's proposed judgment in its entirety, he argues, the circuit court abdicated its role as judge of law and fact.

¶ 27    "When a court is required by law to exercise its discretion, the failure to do so may itself constitute an abuse of discretion *** ." *Seymour v. Collins*, 2015 IL 118432, ¶ 50. However, we cannot, on the record before us, conclude that the adoption of Jalpa's proposed order was necessarily a failure to exercise discretion or a dereliction of the court's duties. "A court order, whoever drafted it, remains the ruling of a judge." *In re Marriage of Oleksy*, 337 Ill. App. 3d 946, 949 (2003). As such, it is immaterial who drafted the judgment. Kamlesh acknowledges that it is common for the circuit court to request draft judgments. He also acknowledges that no Illinois court has held that it is *per se* error for a court to enter an order exactly as drafted by one of the parties. We will not do so now. Kamlesh's contentions of error must succeed or fail based on the contents of the judgment, regardless of who drafted it.

¶ 28                                              Maintenance

¶ 29    Kamlesh next claims that the court erred by deviating from the parties' stipulation that maintenance should be awarded in the amount of "$199.42 for the period of 38 months." Specifically, he argues that the court, *sua sponte*, changed the stipulated maintenance from fixed-term to reviewable.

¶ 30    This court has previously explained the purpose and effect of stipulations:

"A stipulation is an agreement between parties or their attorneys with respect to the business before the court, and, generally, matters which have been stipulated to by the parties cannot be disputed on appeal. [Citation.] While a stipulation need not follow any particular form, it must be clear, certain, and definite in its material provisions, and it is essential that it be assented to by the parties or those representing them. [Citation.] Courts look with favor upon stipulations designed to simplify, shorten, or settle litigation and save costs to parties unless they are illegal or contrary to public policy." *In re Marriage of Galen*, 157 Ill. App. 3d 341, 344 (1987).

¶ 31    In this case, the stipulation was clear, certain, and definite as to the amount and duration of maintenance. Because the maintenance was calculated "[b]ased upon the statutory guidelines set forth in the Illinois Marriage and Dissolution of Marriage Act," it clearly was not contrary to public policy. See *Roanoke Agency, Inc. v. Edgar*, 101 Ill. 2d 315, 327 (1984) (explaining that public policy is expressed in, *inter alia*, a state's statutes). The court, therefore, was correct to accept the stipulation.

¶ 32    Subsection (b-1) of section 504 governs the "[a]mount and duration of maintenance." 750 ILCS 5/504(b-1) (West 2018). The stipulation speaks directly to these two components: "$199.42

[per month] for the period of 38 months." Subsection (b-4.5) governs the "designation" of maintenance, that is, whether the maintenance is for a fixed-term, indefinite, or reviewable. 750 ILCS 5/504(b-4.5) (West 2018). The stipulation is silent on this distinction.

¶ 33    Kamlesh argues that the language "for the period of 38 months" in the stipulation clearly implies that the maintenance was intended to be for a fixed term of 38 months. If the statutory options were either fixed-term or indefinite, this argument would be compelling. However, the designation of "period of 38 months" does nothing to differentiate between fixed-term and reviewable maintenance. Section 504(b-4.5) defines reviewable maintenance as "maintenance *for a specific term* with a review" (emphasis added) and requires that the court "designate the period of the specific term" in its order. *Id.*

¶ 34    The stipulation did not unambiguously represent an agreement as to whether maintenance was to be fixed-term or reviewable. The fact that Jalpa's proposed judgment even requested reviewable maintenance supports the conclusion that the parties had not reached an agreement on that issue. Consequently, the circuit court was entitled—indeed, required by subsection (b-4.5)— to determine whether the maintenance should be fixed-term or reviewable.

¶ 35    Given our deferential standard of review and the circuit court's specific findings about the parties' earning capacities, we cannot find that it was an abuse of discretion to designate the maintenance as reviewable rather than fixed-term.

¶ 36                          Division of Property

¶ 37    Next, Kamlesh argues that the court erred in dividing the marital property. As noted above, such rulings are reviewed for abuse of discretion. *Romano*, 2012 IL App (2d) 091339, ¶ 121. "The touchstone of proper apportionment is whether it is equitable, and each case rests on its own facts.

[Citation.] An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result." *Id.*

¶ 38 "When dividing marital property, the trial court is required to consider all relevant factors, including those listed in section 503(d) of the [IMDMA]." *Id.* ¶ 86. The circuit court's judgment states that "[t]he Court has considered the relevant statutory factors" and includes specific findings of fact related to six of the 503(d) factors. The circuit court found that each of the enumerated factors weighed in Jalpa's favor, and ultimately awarded Jalpa 70% and Kamlesh 30% of the marital estate.

¶ 39 Kamlesh only specifically contends that the court erred in applying two of the statutory factors. He argues that the court improperly weighed the parties' respective contributions to the marital estate and that the court did not consider the value of the property assigned to each party.

¶ 40 As to the value of the property assigned to each spouse, section 503(d)(3) refers not to the value of the marital property divided, but to the value of *non*marital property assigned to each spouse. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. The record contains no evidence that either party is possessed of significant nonmarital property, so that factor does not bear on the circuit court's judgment.

¶ 41 As to the court's analysis of the parties' respective contributions to the marital estate, the trial evidence established that Jalpa worked two jobs, paid money toward Kamlesh's immigration, supported Kamlesh when he first arrived in the country and was the primary caregiver for their child. The evidence also established that Kamlesh did not start earning any significant amount of money or otherwise contribute to the marital estate until he received his master's degree. Thereafter, he lived apart from his wife and child, saved money in his own name, and did not contribute to raising the child or supporting Jalpa.

¶ 42    On the other hand, Kamlesh argues that Jalpa's contributions were not wholly to the benefit of the marital estate. For example, the evidence showed that Jalpa supported her father and her grandmother, and occasionally housed both her mother and her sister without asking them to contribute financially. Moreover, Kamlesh's earnings and retirement savings constituted the vast majority of the property divided by the court. He argues that no reasonable judge could have concluded, as the circuit court did, that the parties' respective contributions to the martial estate "weigh[ed] heavily in Jalpa's favor."

¶ 43    Although our review on this issue is highly deferential, it is not a mere rubber stamp. Illinois courts have reversed other divorce judgments where the trial courts have abused their discretion in disproportionately dividing the marital estate. See, *e.g.*, *In re Marriage of Aschwanden*, 82 Ill. 2d 31 (1980) (reversing 78%-22% division of marital assets) and *In re Marriage of Hobbs*, 110 Ill. App. 3d 451 (1982) (reversing 74%-26% division).

¶ 44    Although Kamlesh relies on both *Aschwanden* and *Hobbs*, those cases are easily distinguished. In the first place, the distribution in this case is not quite as uneven as in those cases. Kamlesh received 30% of the marital assets, which is a greater share than either of the appellants in *Aschwanden* or *Hobbs*. Moreover, in both of those cases, the higher-earning spouse was awarded the greater share of the property. That is precisely the opposite of this case, where the smaller share of the estate was awarded to the higher-earning spouse. Those cases, therefore, offer little support for Kamlesh.

¶ 45    Although there is evidence in support of each side's contention that they were the primary contributor during the marriage, the court clearly credited Jalpa's testimony that she supported Kamlesh at the beginning of the marriage and while he was in school, was the primary caretaker for their daughter, and worked multiple jobs. See *Battaglia v. 736 N. Clark Corp.*, 2015 IL App

(1st) 142437, ¶ 23 ("the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive."). We cannot say that the court erred in finding that Jalpa's contributions to the marital estate outweighed Kamlesh's.

¶ 46    Moreover, because the contribution to the estate is merely one of several factors to be considered, we cannot say that no reasonable person could have arrived the court's division of property. See *In re Marriage of Borg*, 96 Ill. App. 3d 282, 287 (1981) ("If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the court abused its discretion.").

¶ 47                                  Retroactive Child Support

¶ 48    Next, Kamlesh challenges the court's decision to grant retroactive child support. He contends that retroactive child support should have been awarded out of the pre-dissolution marital estate rather than from his post-dissolution portion. He argues that had he paid the temporary support in the first place, the marital estate would have been reduced by that amount. Thus, he reasons, the circuit court gave Jalpa a double recovery because Jalpa receives both the retroactive support *and* 70% of the money that Kamlesh saved by not paying support in the first place.

¶ 49    Although this argument makes some intuitive sense, there is no authority to support it. On this issue, Kamlesh cites only *In re Marriage of Juiris*. In that case the circuit court denied retroactive support, and this court affirmed. *Juiris*, 2018 IL App (1st) 170545, ¶ 20. This court held that the decision not to award retroactive support was not an abuse of discretion because the evidence showed that the respondent had stopped paying the mortgage on the marital home and had liquidated marital property while the case was pending. *Id.* ¶¶ 20-21. Because half of the liquidated property belonged to the petitioner, the respondent had functionally received temporary

support in excess of the guideline amount. *Id.* ¶ 21 Consequently, the trial court could reasonably have concluded that there was no need for retroactive support. *Id.*

¶ 50    Kamlesh argues that because Jalpa received 70% of the marital estate—and an even higher percentage of the liquid assets—*Juiris* requires a reversal of the circuit court's ruling on retroactive child support. However, *Juiris* is easily distinguished. The respondent in *Juiris* received and spent the liquidated assets before dissolution, which served as effective substitutes for actual child support. In this case the evidence showed that Jalpa did not receive any support from Kamlesh between the filing of the divorce petition and the entry of the temporary support order. The cases are simply not analogous.

¶ 51    Moreover, our standard of review is highly deferential. We will only reverse where "no reasonable person would take the view adopted by the court." *Id.* ¶ 19 (quoting *In re Marriage of Toole*, 273 Ill. App. 3d 607, 618 (1995)). The fact that this court *affirmed* in a case where the trial court *denied* a request for retroactive support does not mean that we must *reverse* in a case where the trial court *granted* a request for retroactive support. This would be true even if the cases were more factually similar than they are. We cannot find that no reasonable person would have ordered retroactive support to be paid post-dissolution rather than pre-dissolution. See, *e.g.*, *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1119 (affirming a post-dissolution award of retroactive support).

¶ 52                                      Childcare

¶ 53    Kamlesh next argues that the circuit court erred in ordering him to pay toward childcare. A trial court has discretion to award childcare expenses in addition to statutory child support. *In re Marriage of Moorthy & Arjuna*, 2015 IL App (1st) 132077, ¶ 74. Such an order constitutes a deviation from the statutory guidelines and must be supported by the record. *Id.*

¶ 54    Kamlesh's arguments on this point are twofold: (1) the record establishes conclusively that Jalpa has access to adequate free childcare by her family members, and (2) the court improperly allocated the cost of childcare.

¶ 55    As to the availability of free childcare from family members, Kamlesh acknowledges that he provides no caselaw directly on this point. Jalpa contends that the lack of citations to authority on this issue constitutes a violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires that the appellant's brief include an argument section "with citation of the authorities." *Id.* See also *Roiser v. Cascade Mountain, Inc.*, 367 Ill. App. 3d 559, 568 (2006) (failure to cite to supporting authority constitutes waiver). Even if the lack of citations to caselaw on this point were a violation of Rule 341(h)(7), we have the discretion to reach the merits of the issue. See, *e.g.*, *Gillard v. Northwestern Memorial Hospital*, 2019 IL App (1st) 182348, ¶ 48 (reaching the merits of an appeal despite, *inter alia*, a lack of citations to applicable authority).

¶ 56    The trial evidence established that Jalpa works 60 hours per week, which makes childcare a necessity. The evidence also showed that Jalpa lives with her infirm father, her elderly grandmother, and, from time to time, her sister and her mother. We cannot find that the circuit court erred in determining that Jalpa needed to hire childcare rather than obtain free childcare from her elderly, infirm, or transient family members. The fact that relatives, both in the United States and in India, have occasionally provided care for the child does not demand the conclusion that Jalpa must always impose on her extended family. The circuit court's factual determination that Jalpa required additional paid childcare was not against the manifest weight of the evidence.

¶ 57    As to the division of the childcare costs on a 60%-40% basis, Kamlesh contends that the court erred in failing to consider the parties' net income after maintenance and child support. Kamlesh contends that, taking child support and maintenance into account, his net monthly income

is $5,568.23 and Jalpa's is $5,086.10. Consequently, the prorated allocation of the childcare expenses should have been closer to 50%-50%.

¶ 58    Jalpa does not dispute Kamlesh's calculations but argues that the court had discretion to ignore the parties' respective net incomes and focus on the differences in their gross incomes. However, the IMDMA directs that "[c]hild care expenses *shall* be prorated in proportion to each parent's percentage share of combined net income ***." (Emphasis added.) 750 ILCS 5/505(a)(3.7) (West 2018). "Generally, the word 'shall' is regarded as indicative of mandatory intent." *People v. Bledsoe*, 268 Ill. App. 3d 869, 871-72 (1994).

¶ 59    Although we find that the circuit court did not err in awarding childcare expenses in the first instance, we find that the circuit court did err in not considering the parties' net incomes when allocating those expenses. We therefore vacate that portion of the judgment and remand for a determination on the appropriate allocation of childcare expenses.

¶ 60                                      Health Insurance

¶ 61    Kamlesh next argues that the court erred in its allocation of healthcare expenses for the child. He contends (1) that the court did not properly allocate the cost of the health insurance premiums for the child and (2) that the court impermissibly made his healthcare obligation non-modifiable by ordering that his obligation will continue even if he loses his job.

¶ 62    Kamlesh contends that the IMDMA mandates that the cost of health insurance premiums be allocated between the parties based on their respective net incomes. See 750 ILCS 5/505(a)(4)(D) (West 2018) (the amount of the insurance premium attributable to the child "shall be added to the basic child support obligation and shall be allocated between the parents in proportion to their respective net incomes."). Therefore, he argues, the circuit court abused its discretion by making him responsible for 100% of the health insurance premiums.

¶ 63    Jalpa responds that Kamlesh should be estopped from raising this argument because his own proposed judgment requested that the court order him to pay 100% of the healthcare premiums. See *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶ 29 ("a party cannot complain of an error that he either induced the court to make or to which he consented"). However, Kamlesh's proposed judgment and trial testimony included offers to pay 100% of the insurance premiums *on the condition* that Jalpa cover 100% of out-of-pocket medical expenses. Because the judgment ordered Kamlesh to pay both 100% of the premiums and 60% of out-of-pocket expenses, estoppel is not appropriate here.

¶ 64    Jalpa next responds that the parties' negotiated child support stipulation took the insurance premiums into account. This, she argues, effectively reduced Kamlesh's monthly obligation in lieu of specifically allocating to Jalpa a percentage of the insurance premiums. There are two problems with this response. First, the record is silent on the negotiations behind the stipulated child support amount; all that we have before us is the judgment and the stipulation. Second, the IMDMA mandates that such judgments specifically reflect the percentage of health insurance premiums allocated to each party. 750 ILCS 5/505(a)(4)(D) (West 2018). If, by virtue of the calculations underlying the stipulation, Jalpa *is* responsible for a percentage of the health insurance premiums, that is certainly not reflected in the text of the judgment.

¶ 65    The IMDMA requires that health insurance premiums be allocated based on net income. As written, the judgment does not satisfy that requirement. We vacate that portion of the judgment and remand for reallocation consistent with the requirements of the IMDMA.

¶ 66    Kamlesh's second argument regarding his healthcare obligation is that the court impermissibly made that portion of the judgment non-modifiable. Ordinarily, loss of employment could constitute a "substantial change" that warrants a modification of one's support obligations.

See *In re Marriage of Verhines and Hickey*, 2018 IL App (2d) 171034, ¶ 51 ("A child-support judgment generally can be modified only upon a showing of a substantial change in circumstances.") However, a change "based on events that were contemplated and expected by the trial court when the judgment of dissolution was entered" does not constitute "a substantial change in circumstances". *In re Marriage of Salvatore*, 2019 IL App (2d) 180425, ¶ 24. Therefore, Kamlesh reasons, the circuit court effectively foreclosed his ability to seek modification of the healthcare provision if he loses his job. In this respect, he contends, the judgment is at odds with the IMDMA's provision that "[c]hild support *** may be modified upon a showing of a substantial change in circumstances." 750 ILCS 5/502(f) (West 2018).

¶ 67    We agree that the circuit court erred in crafting the provision in question. The court heard no evidence about what health insurance for the child would cost were it not available through Kamlesh's employer, nor was there any evidence about how his unemployment would affect the parties' respective financial positions. In short, the record does not support the decision to require Kamlesh to pay 100% of the healthcare costs in the event of his unemployment. With no evidence whatsoever to support the circuit court's ruling on this point, the provision regarding Kamlesh's hypothetical loss of employment was in error. See *In re Marriage of Moore*, 117 Ill. App. 3d 206, 209 (1983) (support should be based on "present ability to pay support" rather than "possible future financial resources"). We therefore vacate that provision.[2]

¶ 68                                 Attorney Fees

¶ 69    Finally, Kamlesh argues that the court erred in ordering that he pay 75% of Jalpa's attorney fees. He makes several distinct arguments. First, he contends that Jalpa did not establish her own

---

[2] As a practical matter, the provision is probably redundant anyway. If Kamlesh were to lose his job, his support obligations would remain in effect unless and until modified by the circuit court. See *In re Marriage of Culp*, 341 Ill. App. 3d 390, 400 (2003) (maintenance and support orders may be modified retroactively to the date of the filing of the petition for modification).

inability to pay. Second, he argues that the court erred in not ruling on the reasonableness of the attorney fees. Third, he argues that the IMDMA required the court to conduct an evidentiary hearing before awarding attorney fees. Finally, he argues that the court erred by not ruling on the petition for contribution before entering its final judgment on his petition for dissolution.

¶ 70 As noted above, an award of contribution toward attorney fees is reviewed for abuse of discretion. *Price*, 2013 IL App (4th) 120155, ¶ 39. However, we apply the manifest-weight-of-the-evidence standard to the circuit court's factual findings. *Romano*, 2012 IL App (2d) 091339, ¶ 121.

¶ 71 "The primary obligation for the payment of attorney fees rests on the party on whose behalf the services were rendered." *In re Marriage of Sadovsky*, 2019 IL App (3d) 180204, ¶ 54. However, the IMDMA "allows the trial court to order a party to contribute a reasonable amount of the opposing party's fees where one party lacks the financial resources and the other party has the ability to pay." *Id.* The same criteria used to determine the division of marital property and maintenance are used to determine contribution. *Id.* (citing 750 ILCS 5/503(j)(2) (West 2016)). To be entitled to such an award, the spouse seeking contribution must establish her inability to pay and the other spouse's ability to pay. *Id.*

¶ 72 Kamlesh's contention that the circuit court should have held an evidentiary hearing logically precedes his other arguments, so we address that issue first. The IMDMA states, in pertinent part, that "before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided." 750 ILCS 5/503(j) (West 2018). "Use of the word 'shall' creates an affirmative duty on the trial court to hear and decide fee-contribution petitions." *In re Marriage of Selinger*, 351 Ill.App.3d 611, 622 (2004). This does not require an additional hearing, necessarily, but the court must hear "additional proofs, through testimony or otherwise." *Id.* A trial court's failure to conduct a hearing is not always dispositive. *Id.* For

example, in *Selinger*, this court affirmed the denial of a petition for contribution without a hearing because "[t]he assets and liabilities of the two parties were before the court already, as was the amount of [the petitioner's] attorney fees." *Id*.

¶ 73 In that respect, this case is very much like *Selinger*. The court had before it ample evidence on the parties' respective finances. It also had Jalpa's attorney's affidavit regarding fees. Moreover, the court had Kamlesh's written objections, challenging the attorney fees and challenging the evidence. The court, therefore, was adequately situated to rule on the petition without an additional hearing. See *id.*

¶ 74 Kamlesh's next contention is that Jalpa failed to establish her ability to pay and his ability. Jalpa responds that the record supports its findings that she was unable to pay and that Kamlesh was able. She points to the court's award of a disproportionate share of the marital estate and the parties' stipulation as to maintenance, both of which are based on the same sets of criteria used to determine contribution. The fact that disproportionate division and maintenance were appropriate, she reasons, supports the conclusion that contribution was also appropriate.

¶ 75 Kamlesh counters, however, that the disproportionate division and the orders for child support and maintenance militate *against* a finding that Jalpa was unable to pay her own attorney's fees. He points to *In re Marriage of Schneider*, (214 Ill. 2d 152 (2005)), in which our supreme court affirmed the denial of a petition for contribution on the ground that the petitioner failed to establish that she was unable to pay and that the respondent was not. *Id.* at 175. The *Schneider* court "note[d] that [the husband's] greater earning capacity was taken into consideration in awarding [the wife] a disproportionate share of the marital estate and in setting the amount of child support." *Id.*

¶ 76    Kamlesh points out that after accounting for maintenance and support, the parties now have very similar net monthly incomes. On top of that, the circuit court awarded Jalpa most of martial estate, including the bulk of the liquid assets. For this reason, the court's finding that Jalpa was unable to pay her attorney fees appears not to be based upon the evidence and was consequently against the manifest weight of the evidence. See *Romano*, 2012 IL App (2d) 091339, ¶ 44. Because that finding was a necessary predicate for the court to award contribution (*Sadovsky*, 2019 IL App (3d) 180204, ¶ 54), the circuit court erred in granting Jalpa's petition for contribution. Having concluded that the circuit court erred in granting contribution, we need not address Kamlesh's remaining contentions on this issue.

¶ 77                                              CONCLUSION

¶ 78    We reverse the circuit court's award of contribution to attorney fees because the record does not support the conclusion that Jalpa was unable to pay her own fees. We vacate the portions of the judgment allocating childcare and healthcare, and we remand with instructions to reallocate those costs in accordance with IMDMA's directives that they be allocated in proportion to the parties' net incomes. See 750 ILCS 5/505(a)(3.7) (West 2018) ("[c]hild care expenses shall be prorated in proportion to each parent's percentage share of combined net income ***."); 750 ILCS 5/505(a)(4)(D) (West 2018) (the amount of healthcare premium attributable to the child "shall be allocated between the parents in proportion to their respective net incomes."). We affirm the judgment of the circuit court in all other respects.

¶ 79    Affirmed in part, reversed in part, vacated in part, and remanded with instructions.